NORTH JACKSON PHARMACY, INC.,   )
et al., etc.,                 )
                             )
           Plaintiffs,   )
                             )
   v.                   )   No.  04 C 5674
                             )
CAREMARK RX, INC., et al.,    )
                             )
          Defendants.   )

## MEMORANDUM ORDER

North Jackson Pharmacy, Inc. and C & C, Inc. d/b/a Big C Discount Drugs, Inc. (collectively "North Jackson," treated for convenience as a singular noun) brought suit individually and on behalf of all other similarly situated independent pharmacies against Caremark Rx, Inc. and Caremark, Inc. (collectively "Caremark," also treated for convenience as a singular noun), charging violations of Section 1 of the Sherman Act, 15 U.S.C. §1 ("Section 1"). This Court originally inherited this action via a 28 U.S.C. §1404(a) transfer from the United States District Court for the Northern District of Alabama, where it had been part of a three-case package of putative class actions.

Shortly after the transfer, Caremark filed a Fed. R. Civ. P. ("Rule") 12(b)(6) motion to dismiss the Second Amended Complaint ("SAC") with prejudice. North Jackson's responsive memorandum included a copy of the 25-page opinion issued by the transferor judge, Honorable Virginia Emerson Hopkins, that rejected a like Rule 12(b)(6) motion that had sought to dispatch the selfsame SAC

in the two cases that were retained in the Alabama District Court (<u>North Jackson Pharmacy, Inc et al., etc. v. Express Scripts, Inc.</u>, 345 F.Supp.2d 1279 (N.D. Ala. 2004) ("<u>Express Scripts</u>")) Adopting the reasoning set out in <u>Express Scripts</u> without repeating Judge Hopkins' meticulous analysis, this Court summarily denied Caremark's Rule 12(b)(6) motion and ordered an answer to the SAC.

Caremark answered the SAC, and it has now filed a Rule 16 issue-narrowing motion that seeks an order from this Court establishing the rule of reason as the standard of analysis applicable to one of North Jackson's two Section 1 claims. For the reasons set out below, Caremark's motion is granted.

Rule 16

In part Rule 16(c) permits a court to take "appropriate action, with respect to (1) the formulation and simplification of the issues...[and] (9) such other matters as may facilitate the just, speedy, and inexpensive disposition of the action." Resolution of issues as a matter of law under Rule 16 is analogous to a Rule 56(d) proceeding as to those issues (but not as to the entire case) in the summary judgment area (see 6A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, <u>Federal Practice & Procedure: Civil 2d</u> §1529, at 299-301 (2d ed. 1990)). But there is at least one important difference: Rule 16 motions need not be accompanied by evidentiary statements called for by

2

this District Court's LR 56.1, as is required for Rule 56 motions for summary judgment.

Such evidentiary statements, which serve to highlight which facts are disputed and which are agreed upon as an aid to determining whether the definitive disposition of a case or a discrete portion of a case is appropriate, are not called for when a party moves under Rule 16 only for an order narrowing the legal issues in a case--and none have been submitted here. Here the absence of such statements does not prevent this Court from ruling on the issue presented by Caremark's motion. That issue--the proper standard to be applied to North Jackson's Sherman Act claim--is one of law that can be resolved based on the allegations of the SAC and facts that neither party disputes. What follows then is a summary of the circumstances giving rise to this lawsuit, as set forth by the allegations of the SAC and the undisputed facts as set forth in the parties' submissions.

## Background[1]

Caremark is a Pharmacy Benefits Manager ("PBM") that administers prescription drug benefit plans on behalf of employers, health insurers and other third-party payors of prescription drug costs ("Plan Sponsors") (SAC ¶14). Over 1,200 of such Plan Sponsors have hired Caremark to help control the

---

[1] This opinion uses "C." and "N.J." to identify documents respectively submitted by Caremark and North Jackson.

cost of prescription drugs for their employees or members ("Plan Subscribers") (SAC ¶¶15, 29). Caremark accomplishes that goal by performing a number of functions on Plan Sponsors' behalf, the most important of which for purposes of this motion is the creation of a network of retail pharmacies where Plan Subscribers can purchase discounted drugs (SAC ¶30). Caremark also lowers Plan Sponsors' costs by processing claims, maintaining patient records, creating and managing "formularies" (lists of drugs preferred by a given plan) and negotiating discounts or rebates with drug manufacturers that wish their drugs to be included on plan formularies (C. Mem. 4; C. Ex. 4 at 1-2).

North Jackson is an independent retail pharmacy that, like many retail pharmacies, has entered into an agreement with Caremark to dispense prescription drugs to Plan Subscribers (SAC ¶¶9, 11). In return for inclusion in Caremark's network and access to the large volume of business that such inclusion brings, North Jackson must agree to dispense drugs to Plan Subscribers at a discount from prices charged to its cash-paying customers (SAC ¶30). Such discounted prices, for which Caremark reimburses North Jackson, are set by agreement between Caremark and North Jackson, but are usually determined using a formula based on a drug's average wholesale price plus a dispensing fee (SAC ¶31).

North Jackson objects among other things to Caremark's

4

creation of retail pharmacy networks and its negotiation of
reimbursement rates on Plan Sponsors' behalf. When Caremark
approaches independent pharmacies such as North Jackson for
inclusion in Caremark's network, it presents such pharmacies
with, as North Jackson would have it, a Hobson's choice between
(1) being included in the network and accepting unconscionably
low reimbursement rates for drugs dispensed to Plan Subscribers
and (2) being left out of the network and thereby losing access
to the large volume of business represented by Plan Subscribers
who have an incentive to patronize network pharmacies. North
Jackson's suit thus charges that Caremark's negotiation of those
low reimbursement rates is not a "negotiation" at all, but is
instead a form of coercion that results from an illegal
conspiracy to fix drug prices between and among Caremark and
other PBMs and the Plan Sponsors they represent.

## North Jackson's Section 1 Claims

North Jackson's SAC  alleges two per se violations of
Section 1. Claim I asserts a conspiracy between Plan Sponsors,
using Caremark as their "common agent," to fix the prices paid
independent pharmacies for dispensing prescription drugs to Plan
Subscribers. Claim II charges a conspiracy between Caremark and
PBMs with which it competes to fix those same prices.  To
establish that it is entitled to relief on either claim, North
Jackson must demonstrate that Caremark took part in a "contract,

5

combination...or conspiracy" that unreasonably restrains trade (Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768 (1984)).

Two "complementary categories of antitrust analysis" may be applied to determine whether an alleged restraint of trade is unreasonable (Nat'l Soc. of Prof'l Eng'rs v. United States, 435 U.S. 679, 692 (1978)). Which applies depends on the nature and effects of the alleged restraint (Denny's Marina, Inc. v. Renfro Prods., Inc., 8 F.3d 1217, 1220 (7th Cir. 1993)). Where the competitive effect of an alleged restraint is not readily apparent, the "rule of reason" supplies the standard of analysis. To that end the factfinder evaluates "the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed" to form a judgment about the restraint's competitive significance (Prof'l Eng'rs, 435 U.S. at 692).

But in other cases a restraint's effect on competition is more obvious, so that the "per se" rule is applied instead. Per se treatment is appropriate for a restraint "that falls into the category of agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm caused or the business excuse for their use" (N.W. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co., 472 U.S. 284, 289 (1985)

(internal quotation marks omitted)). Per se treatment, rather than being a distinct method of analysis, follows from the rule of reason and is applied only "[o]nce experience with a particular restraint enables [courts] to predict with confidence that the rule of reason will condemn it" (<u>Ariz. v. Maricopa County Med. Soc.</u>, 457 U.S. 332, 344 (1982)).

Caremark implicitly concedes that the conspiracy alleged in Claim II--that between Caremark and other PBMs to fix drug prices--would if proved constitute a naked horizontal price-fixing agreement subject to per se treatment. But it contests application of the per se rule to Claim I--the "common agent" claim--and seeks this Court's ruling that the rule of reason supplies the standard of analysis as to that claim. Such a ruling falls within Rule 16's purview, Caremark contends, because the choice between per se and rule of reason treatment will bear heavily on the conduct of discovery and, perhaps more importantly, on the propriety of class certification.

This Court of course reserves judgment as to how the standard chosen will affect North Jackson's inevitable class certification motion. But because the choice between per se and rule of reason treatment as to the common agent claim will plainly aid in the formulation of issues and will facilitate the just, speedy and inexpensive disposition of this action, this opinion proceeds to a decision on the merits of Caremark's Rule

16 motion.

## Treatment of North Jackson's Common Agent Claim

North Jackson urges that the alleged conspiracy between the Plan Sponsors and their use of Caremark as a common agent to effect that conspiracy's aim constitutes an illegal horizontal restraint of trade of the nature and type historically subject to per se treatment. Caremark challenges that assertion on two fronts. First it contends that the challenged arrangement between Caremark and the Plan Sponsors it represents is not properly viewed as a horizontal restraint between direct competitors, but is instead more accurately characterized as a series of vertical restraints. Such restraints are, as Caremark observes, generally subject to rule of reason rather than per se treatment and so should be in this case. Second, Caremark argues that even if the SAC is construed to allege a horizontal restraint, the Plan Sponsors' use of Caremark as a common agent is not a "naked" restraint that should be presumed illegal, but is rather "ancillary" to a legitimate cooperative enterprise that has the potential to increase productive efficiency. Consequently that ancillary restraint should be analyzed under the rule of reason. Those contentions will be dealt with in turn.

In support of its first argument, Caremark urges that the proper objects of analysis are the individual contracts between

8

Caremark and the more than 1,200 Plan Sponsors it represents.
Caremark is not a competitor of the Plan Sponsors, operating
instead at a different level of the prescription drug purchasing
chain, and so the argument goes that the contracts at issue are
vertical restraints. And because <u>Business Elec. Corp. v. Sharp
Elec. Corp.</u>, 485 U.S. 717, 724 (1988) emphasized the Court's view
that "the scope of <u>per se</u> illegality should be narrow in the
context of vertical restraints," Caremark says that rule of
reason treatment is proper as to those 1,200 individual
contracts.

But that argument ignores the allegations of the SAC as
construed by <u>Express Scripts</u>, 345 F.Supp.2d at 1294:

> The SAC implies that plan sponsors share, and are aware
> that they share, a common strategy--<u>i.e.</u>, the
> utilization of a PBM to combine purchasing power and
> drive down pharmacy costs.

Under <u>United States v. Masonite Corp.</u>, 316 U.S. 265, 276 (1942)
the Plan Sponsors' knowledge of and acquiescence in that common
strategy  could reasonably support a finding of conspiracy under
Section 1. And as <u>Express Scripts</u>, 345 F.Supp.2d at 1294-95
observed, if the Plan Sponsors have conspired to fix prices "a
horizontal restraint is created even if PBMs are used to carry
out the scheme."

Hence Caremark's assertion that the complained-of agreements
are vertical restraints misses the mark. For purposes of
Pharmacy's common agent claim, the relevant agreement is that

9

alleged to exist among the Plan Sponsors. And that agreement, between firms that would normally compete with each other for the purchase of prescription drugs, may fairly be said to constitute a horizontal restraint.

But Caremark's alternative argument properly stresses that the SAC's allegation of horizontal price-fixing and its asserted attachment of the "per se" label do not, as North Jackson would have it, constrain this Court's ability to scrutinize the alleged agreement to determine whether per se treatment is indeed appropriate (Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1108 (7th Cir. 1984)). This Court's obligation to do so exists because the Supreme Court has cautioned that courts must avoid "formalistic line drawing" (Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 59 (1977)) and must be hesitant to declare, as illegal per se, "restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious" (State Oil Co. v. Khan, 522 U.S. 3, 10 (1997)). To see whether the challenged conduct falls within the per se category, it is thus necessary to consider the alleged agreement among Plan Sponsors in the larger context of the arrangement between them and Caremark.

By negotiating prescription drug reimbursement rates on behalf of the 1,200 Plan Sponsors it represents, Caremark acts on behalf of what is essentially a cooperative purchasing group. In

support of its contention that a cooperative purchasing agreement among Plan Sponsors should not be presumed illegal, Caremark makes much of the distinction made between buyers and sellers under the antitrust laws.

To be sure, that distinction does not carry the full significance Caremark attaches to it, because "a horizontal conspiracy among buyers to stifle competition is as unlawful as one among sellers" (Todd v. Exxon Corp., 275 F.3d 191, 201 (2nd Cir. 2001), citing Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co., 334 U.S. 219, 235 (1948)). But even so, a cooperative purchasing agreement among competing buyers does not necessarily stifle competition. Economists recognize that where buyers join to make purchases, any one of three economic models may exist (Roger D. Blair & Jeffrey L. Harrison, Monopsony: Antitrust Law and Economics 93-94 (1993)):

> First, "cooperative buying" may be nothing more than a euphemism for collusive monopsony that drives prices below competitive levels and has negative economic effects on social welfare similar to those caused by price fixing sellers. Second, a cooperative buyer effort may not result in an aggregation of buying power at all and therefore, the use of this power cannot be the motivation. Instead, these joint ventures are formed for the purpose of exploiting the productive efficiencies that result from conducting business on a larger scale....A third possibility is to have elements of both monopsony, with the attendant losses in allocative efficiency, and joint purchasing efficiency, resulting in productivity gains, at the same time.

Which of those models will stem from a given cooperative purchasing agreement will not always be apparent immediately, so

11

that the question becomes how to analyze such agreements under Section 1. Antitrust's "ancillary restraints" doctrine is well-suited to that task.

Under the ancillary restraints doctrine, courts "must distinguish between 'naked' restraints, those in which the restriction on competition is unaccompanied by new production or products, and 'ancillary' restraints, those that are part of a larger endeavor whose success they promote" (Polk Bros., Inc. v. Forest City Enters., Inc., 776 F.2d 185, 188-89 (7th Cir. 1985)). Naked restraints are unlikely to have any redeeming value and so are usually accorded per se treatment. But ancillary restraints that "may contribute to the success of a cooperative venture that promises greater productivity and output" (id. at 189) demand the more thorough analysis provided by the rule of reason.

As Polk Bros., id. observed, "[t]he evaluation of ancillary restraints under the Rule of Reason does not imply that ancillary agreements are not real horizontal restraints. They are." But because "[a]ntitrust law is designed to ensure an appropriate blend of cooperation and competition, not to require all economic actors to compete full tilt every moment" (id. at 188), such restraints are excluded from per se treatment where they "contribute[ ] to productivity through integration of efforts" (id.).

Broadcast Music, Inc. v. Columbia Broad. Sys., Inc., 441

12

U.S. 1 (1979), a case upon which Caremark relies heavily, applied those principles to a licensing agent's issuance of "blanket licenses" for the performance of all of its client composers' musical compositions. Acknowledging that such a blanket license "involves 'price fixing' in the literal sense" because the composers had joined together in an organization that set the price for the blanket license it sold (id. at 8) the Court nonetheless held that per se treatment was inappropriate because rather than being a naked restraint, the blanket license "accompanie[d] the integration of sales, monitoring, and enforcement against unauthorized copyright use" (id. at 20). And as the Court further explained, "a bulk license of some type is a necessary consequence of the integration necessary to achieve these efficiencies, and a necessary consequence of an aggregate license is that its price must be established" (id. at 21).

While there are few reported cases that apply Section 1 and the ancillary restraints doctrine to cooperative purchasing arrangements, Kartell v. Blue Shield of Mass., Inc., 749 F.2d 922, 925 (2nd Cir. 1984) observed that courts had invalidated such arrangements only where "the buyer was typically a 'sham' organization seeking only to combine otherwise independent buyers in order to suppress their otherwise competitive instinct to bid up price." But where in contrast buyers join together in a productive venture, cooperative buying is rarely viewed as a per

13

se unlawful restraint under Section 1 so long as it contributes
to the productive enterprise.

N.W. Wholesale Stationers thus held that a non-profit
wholesale purchasing cooperative that allowed office-supply
retailers to "achieve economies of scale in purchasing and
warehousing that would be otherwise unavailable to them" (472
U.S. at 286-87) was (id. at 295 (internal quotation marks
omitted)):

> not a form of concerted activity characteristically likely
> to result in predominantly anticompetitive effects. Rather,
> such cooperative arrangements would seem to be designed to
> increase economic efficiency and render markets more, rather
> than less, competitive.

And Addamax Corp. v. Open Software Found., Inc., 152 F.3d 48, 52
(1st Cir. 1998) held that per se treatment was inappropriate
where the alleged anticompetitive conduct--an agreement between a
joint venture's constituent firms as to the price at which the
venture would purchase inputs--was ancillary to the joint
venture's productive contribution to the economy.

Caremark relies on Broadcast Music, N.W. Wholesale and
Addamax to argue that its negotiation of reimbursement rates on
behalf of Plan Sponsors, even if it were to be viewed as
reflective of an otherwise anticompetitive horizontal restraint,
is part and parcel of a larger cooperative enterprise whose
purpose and effect is to increase competition in the insurance-
reimbursed prescription drug market. Any alleged agreement

14

between Plan Sponsors to set the price paid for prescription drugs thus cannot be viewed in a vacuum, but must instead be looked at as a corollary of the cooperative arrangement between Caremark and the Plan Sponsors under which Caremark performs a variety of functions in the administration of Plan Sponsors' drug benefit plans. Those functions include not only the negotiation of reimbursement rates with retail pharmacies but also the processing of reimbursement claims, maintenance of patient records, design and management of drug formularies, negotiation of manufacturer rebates and maintenance of a mail order pharmacy. According to Caremark, those functions contribute to increased efficiency and a reduction in the cost of prescription drugs delivered to Plan Subscribers.

For its part North Jackson argues that the designation of an agreement to lower prices as "ancillary" to a larger cooperative venture does not reflect the true nature of the arrangement between Plan Sponsors and Caremark, whose primary purpose is to lower the price of prescription drugs. But an agreement is not anticompetitive because it seeks to lower prices, and antitrust plaintiffs have to do more than complain about their failure to make more money (Brillhart v. Mut. Med. Ins., Inc., 768 F.2d 196, 200 (7th Cir. 1985)). So the fact that the purpose of the cooperative relationship between Caremark and the Plan Sponsors is to affect drug prices (indeed, to lower them) begs the

question whether it does so in a procompetitive, efficiency-enhancing manner that benefits consumers, or whether instead that goal is accomplished through unlawful collusion that drives prices below competitive levels and thereby reduces social welfare.

As described by the SAC and the parties' submissions on the current motion, the arrangement between Plan Sponsors and Caremark clearly has efficiency-enhancing potential. Caremark specializes in various functions of benefit plan administration and is likely able to achieve economies of scale in the performance of those functions that would otherwise be unavailable to Plan Sponsors. And the creation of retail pharmacy networks, which necessarily involves the setting of reimbursement rates, undoubtedly contributes to the success of that larger endeavor.

What is more, there is a real question whether, on the other side of the coin, the arrangement actually has any countervailing anticompetitive consequences. Last year the FTC had occasion to consider Caremark's negotiation of reimbursement rates on behalf of Plan Sponsors when it investigated Caremark's acquisition of AdvancePCS, a former competitor. Addressing the question whether that acquisition would confer monopsony power on Caremark vis-a-vis retail pharmacies, the FTC explained in its Feb. 11, 2004 statement (In re Caremark Rx, Inc./AdvancePCS, FTC 031-0239, 2004

16

WL 318820):

> A buyer has monopsony power--or a group of buyers has oligopsony power--when it can profitably reduce prices in a market below competitive levels by curtailing purchases of the relevant product or service. The exercise of this power causes competitive harm because the monopsonist or the group will shift some purchases to a less efficient source, supply too little output to the downstream market, or do both.

> In the present case there is no reason to expect a monopsony or oligopsony outcome--i.e., one in which overall purchases from pharmacies are reduced--even if the acquisition enables the merged PBM (or PBMs as a group) to reduce the dispensing fees they pay to retail pharmacies. Characteristics of the relevant market make monopsony or oligopsony power unlikely.

Rather than explaining how the arrangement purportedly reduces competition or responding to the potentially procompetitive aspects of the cooperative enterprise, North Jackson simply asserts that the alleged agreement between plan sponsors is a "naked restraint" on price, going on to list various allegations from the SAC that it says "establish per se violations" (N.J. Mem. 14-15). But none of the allegations listed there pertain to the alleged agreement between Plan Sponsors that is the subject of Claim I. Instead all of those allegations go to Claim II: the alleged horizontal conspiracy between Caremark and its competitor PBMs--a conspiracy that, if established, Caremark acknowledges would constitute a per se violation of Section 1. Such allegations do not negate what has already been said: that the bundle of services provided by Caremark reflects a cooperative arrangement between Caremark and the Plan Sponsors that has efficiency-enhancing potential. And

17

because the alleged anticompetitive agreement between Plan Sponsors is ancillary to that arrangement, it will be assessed under the more probing analysis offered by the rule of reason.[2]

Application of the rule of reason to North Jackson's common agent claim is supported by two other related factors. First, the alleged anticompetitive agreement is one that might at least in the short term result in lower drug prices for consumers. According to a July 2004 joint report of the Federal Trade Commission and the Department of Justice to which Caremark calls the Court's attention, "the empirical evidence suggests that consumers with prescription drug insurance administered by a PBM save substantially on their drug costs as compared to cash-paying customers" (Improving Health Care: A Dose of Competition 7:11, available at: http://www.usdoj.gov/atr/public/health_care/ 204694.htm). As Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc., 40 F.3d 247, 251 (7th Cir. 1994) puts it, the antitrust laws "are designed to drive producers' prices down rather than up." To hold an agreement that tends to lower consumer prices

---

[2] North Jackson's other principal argument in favor of per se treatment is that Caremark has "immense market power" and that its activities should therefore be judged under the per se rule. That argument has no merit. While it is clear that "substantial market power is an indispensable ingredient of every claim under the Rule of Reason" (Digital Equip. Corp. v. Uniq Digital Tech., Inc., 73 F.3d 756, 761 (7th Cir. 1996)), there appears to be no authority (and indeed none is found in the cases North Jackson cites) to support the notion that substantial market power is a sufficient, rather than a necessary, basis for finding that a given restraint is per se unlawful under Section 1.

illegal per se, without careful examination of the agreement's true economic consequences, would seem at odds with the Sherman Act's purpose.[3]

Another and related factor arises from a concern explained by Kartell, 749 F.2d at 931 (citation omitted):

> [T]he subject matter of the present agreement--medical costs--is an area of great complexity where more than solely economic values are at stake. How to provide affordable, high quality medical care is much debated. And, many different solutions--ranging from stricter regulation to greater reliance on competing service organizations--have been proposed. This fact, too, warrants judicial hesitancy to interfere.

That is of particular relevance here, where (as North Jackson itself alleges) PBMs such as Caremark administer the prescription drug benefits of "approximately 210 million Americans; 70% of the U.S. population" (SAC ¶3). Any premature ruling that one of the primary functions performed by PBMs is per se illegal would have particularly far-reaching consequences for the delivery of affordable prescription drugs to a large portion of the population, a consideration that further supports thorough rule

---

[3] It is true that the SAC alleges that consumers will ultimately be harmed by the alleged conspiracy, as "PBMs will bankrupt [independent] pharmacies, thereby capturing a larger segment of the insurance-paid prescription market for the PBMs' own prescription-dispensing business, [which will] allow[] the PBMs to charge higher prices for that service" (Express Scripts, 345 F.Supp.2d at 1292). Whether that is so, however, is a question better answered by a full rule of reason inquiry. What controls for present purposes is that the immediate and assured consequence of the alleged agreement appears to be lower prices for the consumers of insurance-reimbursed prescription drugs.

19

of reason analysis.

What has been said to this point should not be read as expressing an ultimate view as to the lawfulness of the alleged conspiracy between Plan Sponsors. If the required rule of reason inquiry were to reveal that the anticompetitive consequences of any such conspiracy sufficiently outweigh its procompetitive benefits so that the restraint is ultimately judged unreasonable under Section 1, this Court would not hesitate to rule accordingly. But because no authority even suggests that all cooperative purchasing agreements run afoul of Section 1, and because the agreement at issue here is part of a larger and potentially procompetitive enterprise, the rule of reason must be applied to North Jackson's Claim I.

## Conclusion

As North Jackson would have it, the application of such pejorative labels as "horizontal restraint of trade" automatically triggers the application of a malum in se label--a per se violation of Sherman Act §1--that just as automatically renders illegal a group buying arrangement through an intermediary that _lowers_ costs without restricting competition[4] or decreasing output. That universe, generated by an unthinking

---

[4] For purposes of the current analysis, North Jackson's Claim II--that other aspects of Caremark's activities in conjunction with other PBMs assertedly restrict competition--is not implicated in the claim now under review.

adherence to the tyranny of labels, may exist in North Jackson's corporate mind and the minds of its counsel, but it does not exist in the real world of antitrust jurisprudence. Because rule-of-reason rather than per se treatment applies, Caremark's Rule 16 motion on that score is granted.[5]

Milton I. Shadur
Senior United States District Judge

Date: August 12, 2005

---

[5] Whether (as appears likely) this opinion proves to be the last major assignment of this Court's soon-to-depart law clerk Alex Pearce, it well exemplifies his outstanding work throughout his clerkship year. That high quality has marked all of Alex's tenure, whether in the production of draft opinions or in the performance of all the other duties that devolve upon this Court's clerks in what is akin to a three-lawyer law firm. As always it should be made clear, however, that any errors that may have found their way into the final opinions signed by this Court are its responsibility rather than that of its fine clerk, for every such work product has been the result of this Court's word by word and sentence by sentence vetting and recasting of the clerk's original draft.